IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

MALISSIA M. MILLER,

Plaintiff,

v.                                                        Civil Action No. 5:07-CV-131

MICHAEL J. ASTRUE,
Commissioner of Social Security,

Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I. Introduction

A.      Background

Plaintiff, Malissia Miller, (Claimant), filed her Complaint on October 9, 2007, seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on

December 7, 2007.[2]  Claimant filed her Motion for Summary Judgment on June 20, 2008.[3]

Commissioner filed his Motion for Summary Judgment and Memorandum in Support thereof on

July 18, 2008.[4]

B.      The Pleadings

        1.      Plaintiff's Memorandum in Support of Plaintiff's Motion for Summary Judgment.

---

[1] Docket No. 1.

[2] Docket No. 6.

[3] Docket No. 10.

[4] Docket Nos. 11, 12.

2. <u>Defendant's Brief in Support of His Motion for Summary Judgment</u>.

C.    <u>Recommendation</u>

I recommend that:

1.    Claimant's Motion for Summary Judgment be **<u>DENIED</u>** because 1) the ALJ's

treatment of Dr. Malayil's, Ms. Ralston's, and Dr. Golas' opinions, and his finding Claimant did

not meet or equal Listing 12.04, is supported by substantial evidence and involved a correct

application of law; and 2) the ALJ's conclusion Claimant did not meet or equal Listing 1.04, and

his treatment of Claimant's need for a cane and Mr. MacPherson's report, is supported by

substantial evidence, and involved a correct application of law.

2.    Commissioner's Motion for Summary Judgment be **<u>GRANTED</u>** for the same

reasons set forth above.

## II. Facts

A.    <u>Procedural History</u>

Claimant filed an application for Supplemental Security Income on August 5, 2004,

alleging disability since June 2, 2003 due to a work-related back injury, depression, and memory

problems. The application was denied initially on March 2, 2005, and upon reconsideration on

October 11, 2005. Claimant requested a hearing before an ALJ and received a hearing on May

1, 2007. On June 13, 2007, the ALJ issued a decision adverse to Claimant. Claimant requested

review by the Appeals Council but was denied. Claimant filed this action, which proceeded as

set forth above.

B.    <u>Personal History</u>

Claimant was 54 years old on the date of the May 1, 2007 hearing before the ALJ.

Claimant completed eleventh grade and has prior work experience as a certified nurse's assistant (C.N.A). (Tr. 80, 180). Claimant's alleged disability stems from an incident on June 2, 2003 wherein she was working as a nurse at a nursing home, and was attacked by a resident with a chair. She was life-flighted to Pittsburgh Medical Center. (Tr. 178). MRIs did not show evidence of acute trauma. (Id.). On June 11, 2003, she was transferred to Wheeling Hospital where she stayed for one and a half weeks. (Id.).

C.    Medical History

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability: June 2, 2003 through June 13, 2007:

**Christi Cooper-Lehki, D.O., Workers Compensation Psychiatric Independent Medical Examination Report, 8/20/04 (Tr. 178)**
Chief complaint: Mrs. Miller reported that she has suffered from physical problems including daily headaches and partial paralysis, and depression and memory problems following a work-related injury.
Psychiatric History: Mrs. Miller did not meet DSM-IV criteria for any specific psychiatric diagnosis. There was significant evidence of malingering throughout this evaluation. . . . Her description of, and behaviors associated with, mood symptoms and especially her memory loss are very atypical of those observed in persons with true mental illness or mental injury.
Review of symptoms: A review of physical symptoms included weakness in her lower extremities . . . .
Mental Status: . . . She was dressed casually with fair hygiene and grooming. No psychomotor abnormalities were observed. Eye contact was good. Her reported mood was depressed. Affect was restricted in range. There was no evidence of any psychotic form or content, including auditory or visual hallucinations, delusions, or paranoid thinking. She did not disclose any suicidal or homicidal thinking. . . . She was alert and oriented to person and time . . . . Throughout the interview, both with and without Mr. Miller present, there was gross exaggeration and over-endorsement of symptoms.
Assessment: Insofar as my psychiatric evaluation and the neuropsychological testing both conclude malingering, I am unable to render a DSM-IV diagnosis. Therefore I cannot comment on MMI, impairment, disability, or casualty. Although I am unable to render an opinion about a DSM-IV diagnosis, Mrs. Millers reported symptoms, in the absence of malingering, suggest psychiatric diagnoses in the mood and cognitive categories.
Recommendations: Re-evaluation should occur when malingered symptoms are no longer reported or observed. General assessment for psychiatric disorders during routine primary medical care appointments is recommended.

3

**Michael Parsons, Ph.D., University Health Associates, Department of Behavioral Medicine and Psychiatry, 8/26/04 (Tr. 183)**

Impression: Malissia Miller is a 51 old woman with a history of job related injury. On this neurophyschological evaluation, the patient appeared to show a conscious effort to exaggerate or malinger cognitive dysfunction. Given the medical records description, it is possible the patient had a very mild concussion but the deficits she is reporting now could not possibly be explained by this. The development of a stocking/glove anesthesia during her hospital stay could indicate either malingering early on during the stage of this set of problems or could indicate a tendency towards somatoform disorders. The presentation seen on neuropsychological testing today indicates a conscious exaggeration of cognitive problems rather than a somatoform presentation.

**Douglas MacPherson, D.C., MacPherson Chiropractic and Therapeutic Rehab (Tr. 186)**

_/17/04: right leg gives out on her at times. Severe neck pain. Says she has problems with recent memory and cries a lot.

4/13/04: Emotional, cries a lot, numbness, recently into hands. Left leg remains weak. She uses cane.

**Anthony Golas, Ph.D., 11/16/04 (Tr. 200)**

General Observations: Mrs. Miller walked with a slow, careful gait and used a cane to ambulate.

Chief Complaints: Mrs. Miller reported difficulty with her legs and spinal cord injury as problems that limit her ability to work. She also reported depression and anxiety.

Onset: Mrs. Miller reported the onset of the depression and anxiety on June 2, 2003, as well as her physical problems. On that date, Mrs. Miller reported that a patient beat her up at work . . .

Mental Status Examination:

Appearance: Mrs. Miller is a fifty-one year old Caucasian female who appeared older than her stated age. She was dressed casually and her gray hair appeared to be unkempt. She walked with a slow, careful gait and used a cane to ambulate. She listed her weight as 225 pounds and height as 5'3".

Attitude/Behavior: Mrs. Miller's behavior was cooperative. Her general attitude was pleasant toward the examiner.

Social: Mrs. Miller made appropriate eye contact, communicated in sentence form, and was able to carry on a conversation, although overall she appeared to be introverted.

Speech: Mrs. Miller's speech was relevant, coherent, and not pressured. Pace was normal.

Orientation: Mrs. Miller was oriented to time, place, person, and situation.

Mood: Mood appeared to be moderately depressed.

Affect: Affect was restricted in range.

Thought process: Mrs. Miller made some logical associations and was coherent in thinking in speech.

Thought content: Mrs. Miller showed no evidence of delusions, obsessions, or phobias. She was not preoccupied with any topic.

Perceptual: Mrs. Miller showed no evidence of illusions, depersonalization, or hallucination.

4

Insight: Mrs. Miller had good insight, in that she was able to accurately perceive the nature of her problems, emotions, and impairment.
Judgment: Mrs. Miller's judgment was average.
Suicidal/Homicidal ideation: Mrs. Miller stated that suicidal thoughts do "cross her mind" but denied possessing a plan. She denied any homicidal ideation.
Immediate memory: Mrs. Miller's immediate memory was within normal limits.
Recent memory: Markedly deficient.
Remote memory: within normal limits
Concentration: When asked to repeat several sevens, Mrs. Miller demonstrated observable difficulty. Therefore her concentration was markedly deficient.
Psychomotor behavior: Mrs. Miller walked with a stiff, slow, and careful gait. During the evaluation, she stood up throughout some time due to a "stiff back."

DSM-IV Diagnoses
Axis I: Major depressive disorder, recurrent.
 Severe without psychotic features.
Axis III: (by self report) spinal cord injury.

Prognosis: Based on the findings of this evaluation, the prognosis appears to be poor given the fact that Mrs. Miller is not involved in any formal counseling. In regard to her physical impairment, her prognosis appears to be good based on the results of MRI, Glascow Coma Score and CT evaluations (included in report from WVU School of Medicine).
Persistence: Based on observations of Mrs. Miller's ability to stay on task, her persistence was normal.
Pace: Based on clinical observations of Mrs. Miller during the Mental Status Examination and Clinical Interview, her pace appeared to be within normal limits.


**Stephen Nutter, M.D., Tri-State Occupational Medicine, Inc., 12/15/04 (Tr. 209)**
General: The claimant ambulates with a cane in the right hand and minimal limp. Without the cane, she ambulates somewhat unsteadily with a limping gait. The claimant is slightly unsteady when standing without the cane, but was comfortable in the sitting position, but uncomfortable in the supine position. Intellectual functioning appears normal during the examination. The claimant is able to hear and understand conversational tones without difficulty. Recent and remote memory for medical events is good.
Upper extremities: . . . Range of motion testing in the shoulders caused complaints of pain the back. . . .
Lower extremities: There is pain and tenderness noted in the knees when palpating the knees when patient was not talking. There was crepitus in both knees when palpation occurred again when the claimant was talking, there didn't seem to be any tenderness or reaction to pain when palpation occurred of the knees. . . .
Cervical spine: There is tenderness to light touch in the cervical region of the spine as well as tenderness and palpation to the paraspinal muscles and spinous processes. There is no evidence of paravertebral muscle spasm. The cervical spine allows 45 degrees of flexion and 0 degrees of extension, 20 degrees of lateral bending to the right and to 10 degrees to the left and 80 degrees of rotation bilaterally.
Dorsolumbar spine: Examination of the dorsolumbar spine reveals normal curvature. There is no

evidence of paravertebal muscle spasm. There is tenderness to light touch of the lumbar spine through the claimant's clothing. There is tenderness to percussion of the posterior back. . . . Straight leg raise test caused complaints of back pain . . . . The claimant is unable to balance on one leg at one time. . . . Lateral bending of the spine is limited to 10 degrees to the right and to 5 degrees to the left. The claimant complains of pain in the back with range of motion testing of the hips and lumbar spine. . . .

Impression: 1) Chronic back and neck pain. a) Chronic cervical and dorsolumbar strain. 2) Chest pain.

Summary: The clamant is a 51 year old white female complaining of problems with her back and neck since an injury. She had pain and tenderness as described above with a reduced range of motion as noted above. Straight leg raise test was limited and not useful. Grip strength and fine manipulations skills were intact. Sensory modalities were mostly intact with the exception of a few areas that are noted above. Muscle strength testing wasn't useful.

### Joseph Kuzniar, Ed.D., DDS Physician, 1/5/05, (Tr. 215)
Psychiatric Review Technique

Medical Dispositions: RFC Assessment Necessary

Category(ies) upon which the medical disposition is based: 12.04 Affective Disorders

12.04: Affective Disorders: A medically determinable impairment is present that does not
      precisely satisfy the diagnostic criteria above: MDD

Functional Limitation for Listings 12.04
      Restriction of Activities of Daily Living: Mild
      Difficulties in Maintaining Social Functioning: Moderate
      Difficulties in Maintaining Concentration, Persistence or Pace: Moderate
      Episodes of Decompensation, each of extended duration: None

"C" Criteria of the Listings: Evidence does not establish the presence of the "C" Criteria

Notes: The claimant made no allegation on 3368. The FR limitation are consistent somewhat with the current CE. In light of the 8/04 evaluation and the F.O. observation, partial credibility is indicated. The _____.

### Joseph Kuzniar, Ed.D., DDS Physician, 1/5/05, (Tr. 229)
Mental RFC Assessment

Understanding and Memory:

Ability to remember locations and work-like procedure: not significantly limited

Ability to understand and remember very short and simple instructions: no evidence of limitation
      in this category

Ability to understand and remember detailed instructions: not significantly limited.

Sustained concentration and persistence

Ability to carry out very short and simple instructions: no evidence of limitation in this category

Ability to carry out detailed instructions: not significantly limited.

Ability to maintain attention and concentration for extended periods: moderately limited

Ability to perform activities within a schedule, maintain regular attendance and be punctual
      within customary tolerances: moderately limited

Ability to sustain an ordinary routine without special supervision: no evidence of limitation in

this category

Ability to work in coordination with or proximity to others without being distracted by them: moderately limited

Ability to make simple work-related decisions: no evidence of limitation in this category

Ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistence pace without an unreasonable number and length of rest periods: moderately limited.

Social Interaction

Ability to interact appropriately with the general public: not significantly limited

Ability to ask simple questions or request assistance: no evidence of limitation in this category

Ability to accept instructions and respond appropriately to criticism from supervisors: moderately limited

Ability to get along with coworkers and peers without distracting them or exhibiting behavioral extremes: moderately limited

Ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited

Adaptation

Ability to respond appropriately to changes in the work setting: not significantly limited

Ability to be aware of normal hazards and to take appropriate precautions: no evidence of limitation in this category

Ability to travel in unfamiliar places or use public transportation: not significantly limited

Ability to set realistic goals or make plans independently of others: not significantly limited

Functional Capacity Assessment: The MER and RFC rating shows the capacity to understand, remember, and carry out 1-3 step routine instructions within a low social interaction demand work setting. The capacity for adaptation is as rated in Section I-D.

**Family Health Care, Progress Notes (Tr. 233)**

8/11/04:

Assessment: 1) coronary artery disease; 2) acute/chronic thoracic spine strain post-traumatic; 3) possible spinal cord weakness/injury with generalized weakness in both lower extremities.

10/30/04:

Assessment: Agoraphobia; Depression neurosis; Anxiety neurosis.

Plan: She defers psychological counseling consultation for lack of health insurance coverage.

10/23/03: No gross motor deficits.

10/1/03:

Assessment: Pruritus; Anxiety neurosis; insomnia.

9/2/03: Assessment: Muskulo skeletal pain (neck, dorsal spine, lumber spine); Hypertension.

**DDS Physician, 2/28/05 (Tr. 247)**

Physical RFC Assessment

Exertional Limitations

Occasionally - 20 pounds
Frequently - 10 pounds
Stand and/or walk with normal breaks for a total of - about 6 hours in an 8-hour workday.
Sit with normal breaks for a total of - about 6 hours in an 8 hour workday
Push and/or pull - unlimited, other than as shown for lift and/or carry

Postural Limitations:
Climbing ramp/stairs; balancing; stooping; kneeling; crouching; crawling: occasionally
Climbing ladders/ropes/scaffolds: never

Manipulative Limitations: none established
Visual Limitations: none established
Communicative Limitations: none established
Environmental Limitations: Unlimited
Symptoms: Allegations are exaggerated as confirmed by psychological testing. Therefore her credibility is in question.

**Michael Malayil, M.D., Healthways, Psychiatric Evaluation, 3/21/06 (Tr. 258)**
Mental Status Examination: She is a 52 year old moderately obese white female who was walking with the help of a cane. She was well-oriented to time, place, and person. Her mood was labile. She was crying at times. Her thoughts were organized. She was complaining of memory problems. She was able to identify the last two presidents. She denies any psychotic symptoms. Her cognition is fairly intact. She denies any suicidal ideations. She has some insight into her problems.

Diagnostic Impression
Axis I: Major Depressive Disorder
Axis II: No diagnosis
Axis III: History of spinal cord injury.
Axis IV: Chronicity of illness; limited support system.
Axis V: GAF: about 50.

**Amy Ralston, LCSW, Healthways, Intake Evaluation, 1/19/06 (Tr. 260)**
Mental Status Examination
Appearance: appropriate
Attitude: cooperative
Speech: soft, normal
Mood: depressed
Affect: appropriate
Thought process: logical
Thought content: appropriate
Cognitive:
Memory: good
Orientation: person/place/time/circumstance
Insight: good
Estimated intellectual functioning: average

Summary and Impressions: Malissia appeared depressed. She said she was attacked by a resident

8

at Catholic Knights three years ago. He came from behind and beat her with a chair. She was hospitalized and paralyzed. She now suffers from head pain and neck pain and she doesn't let people walk behind her; isolates herself __ without reason and can go into a rage. She does not take a bath because she does not care about ___. She also feels anxious and does not trust people.

Provisional Diagnoses
>Axis I: Major depression
>Axis II: v71.09
>Axis III: neck back pain.
>Axis IV: not working
>Axis V: GAF 50.

## Patsy Cipoletti, M.D., Radiology, Wheeling Hospital, 8/8/02 (Tr. 267)

MRI of the left knee unenhanced

Impression: Probable chondromalacia patellae. Moderate effusion. No other significant findings appreciated.

## Dr. Zaleski, M.D., Wheeling Hospital, 12/9/02 (Tr. 268)

Postoperative diagnosis: torn medical meniscus, left knee.

## UPMC Presbyterian University Hospital, 6/03 (Tr. 271)

Apparently had decreased sensation in motor from her thighs down. However, her reflexes were intact and the patient had normal rectal tone at the time.

Xray of the cervical spine was limited, however, no acute fractures noted. . . . MRI was obtained of thoracic and lumbar spine of the patient that was negative as well.

Consults:
>Neurosurgery: There was a questionable spinal cord injury upon admission. . .

Neurosurgery continued to follow the patient, however, with a negative MRI for cord injury, compression, or nerve root compression. Neurosurgery suspected hysterical disorder, possibly malingering.

>Psychiatry is also consulted. . . . The patient without any psychosis. Psychiatry believes the diagnosis of Adjustment Disorder NOS.

## Dr. Juan Ochoa, UPMC Presbyterian University Hospital, 6/8/03 (Tr. 273)

Assessment and Plan: Doing well. Working with physical therapy and occupational therapy.

## Dr. Juan Ochoa, UPMC Presbyterian University Hospital, 6/7/03 (Tr. 274)

On examination, the patient is awake, alert and oriented. . . . Extremities are well perfused. She is moving her toes. There is good perfusion of the lower extremities.

## Dr. Juan Ochoa, UPMC Presbyterian University Hospital, 6/4/03 (Tr. 275)

Neurosurgery has helped us in the evaluation of this patient. MRIs have failed to find any anatomical injuries. . . .

**Dr. Juan Ochoa, UPMC Presbyterian University Hospital, 6/3/03 (Tr. 279)**

MRI of thoracic and lumbar spine

Thoracic spine: thoracic spine has normal anatomic alignment, with normal size of both thoracic vertebral bodies and discs. A . . . round lesion is present along the inferior end plate of the T6 vertebral body and demonstrates T1 and T2 prolongation. A round lesion measuring . . . is present along with the superior-anterior T9 vertebral body and demonstrates T1 and T2 prolongation. These findings may represent early end plate changes versus atypical hemangiomas. Their indeterminate nature should be further evaluated with a bone scan. The lesions are not traumatic in nature. The posterior tissues are without abnormal signal, and there is no evidence of ligamentous injury. The spinal cord has normal size and signal throughout.

Impression: two foci of abnormal signal within the inferior end plate of T6 and the superior end plate of T9 which are of indeterminate nature. They may represent early end plate changes of atypical hemangiomas. Correlation with a bone scan is recommended. These lesions are not traumatic.

Lumbar spine: The conus medullaris is at L1-2. Lumbar vertebral bodies have normal size and signal. A very small central annular tear is present at L5-S1 with a tiny central disc herniation. No impression of the thecal sac is present, and the neural foramina are patent bilaterally. The remainder of the intervertebral discs are normal in size and demonstrate desiccation which is age appropriate. Round few-millimeter areas of T2 and T1 increased signal are present within the inferior end plates of L2 and L4. These are nonspecific and may represent hemangiomas of early and plate changes,.

Impression: 1) Small annular tear at L5-S1, with very small central disc herniation and no compression of the thecal sac. 2) Negative for acute lumbar spine trauma.

**Dr. Juan Ochoa, UPMC Presbyterian University Hospital, 6/3/03 (Tr. 281)**

CT C-Spine: . . . There is no evidence of a fracture. The prevertebral soft tissues are normal. There is no interspinal hemorrhage. The spinal cord appears to be of normal size. Alignment appears to be antomic.

**Dr. Juan Ochoa, UPMC Presbyterian University Hospital, 6/2/03 (Tr. 287)**

Impression: no evidence of acute fracture on portable lumbar spine radiograph.
Laboratory results: Initial films failed to reveal any fractures or deformities of her thoracic or lumbar spine.

**Cari Woods, PT, Peterson Rehabilitation Hospital, 6/11/03-6/17/03 (Tr. 292)**

Functional Status at discharge:
      Alert: yes
      Orientation: x4
      Standing balance: good, with cane.

Comments: Patient has shown inconsistencies with LE strength grades and functional level. Patient does not appear to put full effort into testing. Patient has also stated she has some paranoia since the incident of having a chair thrown at her by a resident in the nursing home where she is employed.

**Nicholas Martin, LPT, Summit Physical Therapy, 8/1/03 (Tr. 300)**
Assessment: spinal cord contusion with hypersensitivity and decreased strength and ambulation ability.

**Robert Kaminski, CRC, CCM, Ohio Valley Rehabilitation Network, Inc., 9/10/03 (Tr. 302)**
Dr. Liebeskind is our physiatrist. He examined Mrs. Miller and had the impression of chronic pain syndrome superimposed upon a traumatic event. He believes that a global pain management program that would stress psychological and social issues, as well as physical ones, would be recommended. . . .
The psychologist noted severe depression and extreme high levels of anxiety. These could be barriers to any medical or vocational progress. . . .
The physical therapist notes that she is physically impaired because of pain and anxiety, limiting function, decreased range of motion and muscle strength, impaired gait and impaired single limb balance with soft tissue tenderness and anxiety with palpitation.

**Theresa  Palkovic, PT, Ohio Valley Rehabilitation Network, Inc., 9/10/03 (Tr. 303)**
Observation: The client ambulated into physical therapy with a straight cane on the right. The client became diaphoretic and anxious with evaluation. As the evaluation progressed, she developed shaking in the upper extremities.
Palpation: Tender over the posterior cervical area and along the thorocolumbar paraspinals. The client winced and became diaphoretic and panicky with attempts at palpation of the neck and back.
Active Range of Motion:
> Trunk forward bend (normal 90 degrees): ^ 30 degrees
> Truck backward bend (normal 30 degrees): neutral only
> Trunk side bend:
>> Right: 50% complained of pain
>> Left: 50%
> Cervical forward bend (normal to chest): to chest
> Cervical backward bend (normal 15 cm or more): 14 cm
> Cervical rotation (normal as cm or less):
>> Right: 11 cm
>> Left: 11 cm

Manual Muscle Strength: See Tr. 306
Mobility: The client could not perform heel walk, toe walk, heel to toe gait or grapevine without loss of balance. The client (when ambulating without her cane) ambulates with a toe down first gait patterns. Steppage is noted bilaterally and the client keeps her arms out to the side for balance. In addition, the client constantly looks behind herself even when assured no one is going to follow her.
Impression: the client presents with chronic pain and general deconditioning secondary to a traumatic injury. She demonstrates "panic" and anxiety which also contributes to her inability to function at this time.
Prognosis: The prognosis for improvement is good with a multidisciplinary Pain Management Program. Physical rehabilitation alone is not likely to be successful unless the post traumatic

symptoms of the injury are addressed as well.

### David Liebeskind, M.D., Peterson Rehabilitation Hospital and Baristic Center, 9/20/03 (Tr. 311)

Review of systems: Ten basis systems discussed and essentially negative other than her presenting complaints.

On physical examination related to the neuromuskulo-skeletal system: the patient is a stated height of 5'2" and weight of 229 pounds. On observation, she has essentially normal posture, no significant kyphosis, scoliosis or pelvic obliquity. Range of motion is globally reduced with pain in every direction. She is not able to walk on her heels or toes. On observation of the lower extremities: the right calf is slightly smaller than the left. . . . Straight leg raising causes pain on the right at about 90 degrees and on the left at about 40 degrees. . . . On palpation, she has rather exquisite pain extending from the cervical down to the lumbosacral area.

Impression: chronic pain syndrome superimposed upon a traumatic event.

### Wladimir Zyznewsky, M.D., Valley Professional Center, 9/16/03 (Tr. 313)

At the exam, alert, oriented, was able to give history. Her attention, concentration spans appeared to be unremarkable. She was able to spell HOUSE forwards and backwards, was able to perform simple calculations. Cranial nerves, II throughout XII, unremarkable, visual fields intact, fundoscopic exam benign.

She is ambulatory, reflexes were depressed, plantar reflexes were down going. Sensory exam, reports to feel pin prick, vibration sense and light touch. She had difficulty squeezing, complaining of back pain. Cerebellar functions seem to be intact.

### Bruce Guberman, M.D., Tri-State Occupational Medicine, 1/8/04 (Tr. 315)

Physical examination:

The claimant is a middle aged female who ambulates with an antalgic limping gait using a cane. She is able to walk without the cane. Without the cane, her gait is slow and appears to be unsteady. She is also unsteady at station. She claimant is uncomfortable in the supine and sitting position.

Examination of the cervical spine reveals moderate tenderness, but no paravertebral muscle spasm. Three consecutive measurements of flexion of the cervical spine are as follows: (see Tr. 318)

Spine curvature is normal. Three consecutive measurements of flexion of the lumbar spine are as follows:. . . . The claimant is not able to stand on one leg at a time. . . . Straight leg raising is diminished to 68 degrees on the right and 66 degrees on the left in the supine position. Straight leg raising is diminished to 80 degrees bilaterally in the sitting position. There is no evidence of leg shortening.

Examination of the thoracic spine reveals moderate tenderness, but no spasm. Flexion of the thoracic spine is diminished to 22 degrees. This was verified on 3 consecutive measurements. Rotation of the thoracic spine is diminished to 9 degrees towards the right and 12 degrees towards the left. . . .

On neurological examination, there is diffuse weakness of both legs being graded 4 1/2/5. . . . There is no other evidence of muscle weakness or atrophy. Rapid alternating movements,

finger-to-nose and heel-to-shin maneuvers are performed without difficulty. Muscle strength appears to be normal in all four extremities.

The claimant cannot walk on her heels, toes, walk heel-to-toe or squat.

Impression:

1) Acute and chronic thoracic spine strain, post-traumatic.

2) Possible spinal cord injury causing mild generalized weakness in both lower extremities.

. . . The claimant is currently not working. Based on her prior job description, I do not believe she could return to that type of employment. Therefore, a Vocational Rehabilitation assessment is recommended.

. . . The following impairment rating is recommended. . . . In regards to the thoracic spine aspect of this injury . . . 2 percent impairment of the whole person. . . . In regards to the spinal cord injury, . . . 9 percent impairment of the whole person.

## Mark Wilson, M.D., Trinity Work Care, 1/27/04 (Tr. 322)

. . . Malissia is obviously depressed in appearance and I feel that this is also related to the 6/2/03 incident and should be considered a related diagnosis. Malissia will need to be referred for a psychiatric assessment and follow up.

## Judith Brown, M.D., Tri-State Occupational Medicine, 7/29/04 (Tr. 323)

General: The claimant becomes tearful during the examination and interview at times. She ambulates with an antalgic gait. The stance phase is slightly decreased on the right. She also walks very slowly. She carries a cane in the right hand. She does attempt to walk without the cane and when doing so, walks very gingerly and slowly, but without a limp. She appears stable at station and comfortable in the supine and sitting positions. Intellectual functioning appears normal during the examination. She is able to follow simple commands and instructions without difficulty. Conversational speech is heard and understood without difficulty.

Musculoskeletal:

Examination of the cervical spine reveals no paravertebral muscle spasm. Percussion of the spinous processes is associated with diffuse tenderness over the entire cervicotheoracolumbar spine. There is also noted to be diffuse tenderness over the soft tissues over the entire cervical, thoracic and lumbar regions. Range of motion of the cervical spine is significantly decreased with reports of pain.

Examination of the dorsolumbar spine reveals normal curvature. There is no evidence of acute paravertebral muscle spasm.

Range of motion studies of the lumbar spine were felt to be affected by pain, as the claimant reported significant pain during these maneuvers.

Assessment: lumbar strain.

Summary: . . . Examination reveals decreased range of motion of the lumbar spine, which is at least in part affected by pain. There is also decreased range of motion of the thoracic spine and of both shoulders. There is noted to be diffuse tenderness over multiple structures in the cervical, thoracic and lumbar areas. . . . A few of her symptoms are also coachable or disappear when she is distracted. These findings suggest there may be some somatic amplification of symptoms present.

**Joseph Schreiber, D.O., 10/26/04 (Tr. 337)**

Examination:

-She carries a cane in her right hand, but her gait and stride are symmetric.

-Straight leg raising (seated) is 90 degrees symmetrically, without any symptomatology.

-Straight leg raising (supine) is 35 degrees right, 38 degrees left, with complaints of back pain, but not radicular symptoms.

-Sensation of the lower extremities is normal throughout.

-Claimant is able to squat and arise, with ease.

-Claimant is able to stand on her toes, and tandem walk. She is able to stand on her heels, but her balance is awkward with doing so.

-She is able to stand on either foot independently.

Clinical Impression:

1) Sprain/strain of the medical collateral ligament, resolved.

2) S/P left knee arthoscopy, partial medical meniscectomy.

3) Severe depression (unrelated).

4) Overweight (unrelated).

5) Unrelated lumbar compensation claim, with symptom magnification.

**Douglas MacPherson, D.C., MacPherson Chiropractic and Therapeutic Rehab, (Tr. 346)**

6/19/06: Depression and anxiety remain.

8/14/06: Most problems are due to depression and anxiety. She talks about suicide.

1/4/06: She is very depressed, said she has constant neck pain now.

5/16/05: Hurts everywhere.

3/7/05: She is very miserable today. Whole body hurts.

**Douglas MacPherson, D.C., MacPherson Chiropractic and Therapeutic Rehab, 7/25/06 (Tr. 356)**

To whom it may concern: It is my opinion that Malissia Miller remains T.T.D. due to injuries sustained on 6/2/03. I am waiting for authorization to refer her to a chronic pain specialist. She is very depressed. I recommend that she continue under the care of a psychiatrist at Healthways.

**Douglas MacPherson, D.C., MacPherson Chiropractic and Therapeutic Rehab, 12/21/05 (Tr. 357)**

To whom it may concern: It is my opinion that Malissia Miller remains T.T.D. due to injuries sustained on 6/2/03 while working. We are currently waiting for approval for a cervical MRI and neurosurgical eval. Depending on when tests are approved her estimated date of recovery would be 4/1/06.

**Amy Ralston, MSW, Healthways, 4/6/06 - 3/1/07 (Tr. 360-367)**

3/1/07: She still suffers chronic pain. She is not bathing regularly.

12/4/06: She looked unkept. . . . She is still severely depressed. She gets out when she can.

9/14/06: She has been in chronic pain from the accident . . . . She has had suicidal thoughts daily.

7/19/06: She is in chronic pain and severely depressed and is now having some cognitive

14

problems.
5/22/06: She is in chronic pain due to the spine injury she suffered.

### Amy Ralston, MSW, Healthways, 3/12/07 (Tr. 368)

1. Does Malissia Miller suffer from disturbance of mood accompanied by depressive syndrome?
Yes. (Mood, as used in this definition, refers to a prolonged emotion that colors the whole psychic of life).
2. Does Malissia Miller suffer from any of the following as a result of her depression?
    Anhedonia or pervasive loss of interest in almost all activities: Yes
    Appetite disturbance with a change in weight? Yes
    Sleep disturbance: Yes
    Psychomotor agitation or retardation: Yes
    Decreased energy: Yes
    Feelings of guilt or worthlessness: Yes
    Difficulty concentrating or thinking: Yes
    Thoughts of suicide: Yes
    Hallucination, delusions or paranoid thinking: No
3. Do the symptoms which you have indicated above result in any of the following?
    Marked restriction of activity of daily living? Yes
    Marked difficulties in maintaining social functioning? Yes
    Deficiencies in concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere)? Yes
    Related episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation to experience exacerbation of signs and symptoms (which may include deterioration or adaptive behaviors)? No.

### Michael Malayil, M.D., 3/20/07 (Tr. 371)

1. Does Malissia Miller suffer from disturbance of mood accompanied by depressive syndrome?
Yes. (Mood, as used in this definition, refers to a prolonged emotion that colors the whole psychic of life).
2. Does Malissia Miller suffer from any of the following as a result of her depression?
    Anhedonia or pervasive loss of interest in almost all activities: Yes
    Appetite disturbance with a change in weight? Yes
    Sleep disturbance: Yes
    Psychomotor agitation or retardation: No
    Decreased energy: Yes
    Feelings of guilt or worthlessness: Yes
    Difficulty concentrating or thinking: Yes
    Thoughts of suicide: No
    Hallucination, delusions or paranoid thinking: No
3. Do the symptoms which you have indicated above result in any of the following?
    Marked restriction of activity of daily living? Yes
    Marked difficulties in maintaining social functioning? Yes
    Deficiencies in concentration, persistence, or pace resulting in frequent failure to

complete tasks in a timely manner (in work settings or elsewhere)? Yes
Related episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation to experience exacerbation of signs and symptoms (which may include deterioration or adaptive behaviors)? Yes

**Douglas MacPherson, D.C., MacPherson Chiropractic and Therapeutic Rehab, 3/27/07 (Tr. 375)**

Functional Capacity Evaluation

1.   In an 8 hour workday, the patient can stand/walk: 2 hours.
2.   How long can the patient stand/walk at one time? 30 minutes
3.   In an 8 hour workday, the patient can sit: 2 hours
4.   How long can the patient sit at one time? 1 hour
5.   Lifting/carrying limitations
         Occasionally, up to 10 pounds.
         Occasionally, 11-20 pounds.
         Never 21-50 pounds.
         Never 51-100 pounds.
6.   Hands can be used for repetitive action such as simple grasping/fine manipulation.
7.   Feet can be used for repetitive movement as in operating foot controls: No (both right and left)
8.   Patient is able to:
     Work about the shoulder level: occasionally
     Bend/twist: occasionally
     Turn and twist: occasionally
     Crawl: never
     Climb: never
     Push/pull: occasionally
9.   Has this patient reached the end of his healing period? No. Continue with psychiatrist and psychologist on a permanent basis.
10.  List other restrictions or limitations: Severe depression/anxiety.

D.   Testimonial Evidence

     Testimony was taken at the May 1, 2007 hearing.  The following portions of the

testimony are relevant to the disposition of the case.

BY ATTORNEY:

     Q     As far as your walking, do you walk without the cane at any time, even in your

own home?

     A     Yes, I do.

16

Q    And when do you walk without the cane?

A    In my house, most of the - - you know.  Okay, in my house because I can hold onto something in case I go to fall or something.

Q    Do you ever walk where you don't have a means of support?

A    No.

Q    Be it a cane or something to put your hands on?

A    No.

Q    Have your legs ever gone out from under you before?

A    Yes.

Q    How often does that happen?

A    It happens probably about, probably twice a day.

Q    But they don't always result in falls, or - -

A    No.

Q    - - do they result in falls?

A    No.  Sometimes they do.

Q    Well, do you still go to church on occasion?

A    Every once in a while, yes.

Q    And why - - how do you deal with the crowds at church?

A    I set with my back clear in the back of the, the church, up against the wall.

Q    And has your church made arrangements to accommodate you?

A    Yes.

Q    Now as far as concentration, has your concentration decreased?

A     Yes.

Q     Could you give us some examples of your decreasing concentration?

A     Yesterday our car broke down, and my husband had me to hold a piece of pipe or something for him while he was fixing it. And I forgot that I was even - - what - - even what it was for and that he even asked me about it. And I just - - cutting stuff up and stuff, I'll forget about doing it. I'll put something on the stove and I'll forget about that I've done that.

Q     Now when last we spoke you told me you still had a - - have a driver's license, correct?

A     Yes.

Q     Now how often, if at all, do you drive?

A     When I go to church I drive there.

Q     How far is that from your house?

A     Probably about two-three miles; I'm not really sure.

Q     Do you drive anywhere where you don't know how to get there?

A     Sometimes. I'll be going to church, and I'll forget how to get there.

Q     Now, how'd you get down from Wellsburg to the hearing today?

A     My pastor brought me today.

Q     Okay, and how, how was, how was it walking from the parking garage to the hearing?

A     It was horrible. I was - - it - - I was watching everybody, because I was afraid they was going to hurt me. I was - -

Q     Is that a common feeling you have when you're around other people?

18

A       Yes.

                    *                *                *

Q       Okay.  On a scale of one to ten, on a good day, one being no pain, ten being a
pain no human being can stand, how would you rate your pain, on a good day?

A       On a good day, probably, probably a seven.

Q       And on a bad day?

A       Today - - it's a ten today.

Q       What makes your pain better?

A       Nothing.

Q       What about getting of your feet?

A       I - - if I lay down for a little bit it'll ease up.

Q       How many times a day, from the time you wake up until say, dinner time, do you
have to lay down?

A       Probably about four, maybe five times a day.

Q       And how long do you have to lay down before you feel you're able to resume any
activity?

A       Between a half hour to an hour.

Q       And is that on an average day, or is that a - -

A       That's on - -

Q       - - bad day?

A       That's on an average day.

Q       What kind of housework are you doing these days around your trailer?

19

A      Mainly just dishes.

Q      How long can you do dishes for?

A      I start my dishes when I first get up in the morning, because usually there's stuff there, and I'll start them then I'll go sit down for a little bit.

Q      Well how long is starting them? How long can you pay attention?

A      Waiting - - probably about a half hour.

Q      Do you do any dusting?

A      No.

Q      Vacuuming?

A      No.

Q      Does your husband do those things?

A      Most of the time, or my daughter.

Q      Okay.

A      When she comes around.

Q      Okay. Other than going to church, do you go out and see other people?

A      No.

Q      Do you have people come to see you, other than your daughter?

A      My son comes every once in a while, but that's about it.

Q      Do you have any, any hobbies, or anything that you do for enjoyment?

A      I try to work those find-a-word puzzles.

Q      How successful are you at that - - at those?

A      Not very successful.

Q     Why is that?

A     Because I lose my concentration and I can't get started on them.

*         *         *

Q     Okay. And have you had - - have you been admitted for your depression? Have you been admitted to the hospital, or have you had to go to the emergency room for that?

A     No.

Q     And how - - does your medication help?

A     Some, yes.

Q     Okay. Are you able to cook?

A     Sometimes.

Q     Your kids are grown and gone?

A     Yes.

*         *         *

EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q     Ms. Kurtanich, do you know the claimant, or have you ever discussed the matters of her case with the rep, anyone in their office, with me, or anyone here at Odar (Phonetic)?

A     No, I have not.

Q     And have you reviewed the record and been present during claimant's testimony?

A     Yes, I have.

Q     Any additional questions you need to ask the claimant regarding education or past relevant work?

A     Not at this time.

Q    What is the skill level - - exertional level and skill level of claimant's past relevant work?

A    Yes, she was employed as a nurse assistant; that's an SVP of 4, semi-skilled position, performed at a medium physical exertion level.

Q    Transferable skills?

A    She has transferability to an EKG, SVP 4 - - technician EKG.

Q    What, what exertional level?

A    It's light exertion level. I'm sorry.

Q    EKG tech, you said?

A    Yes.

Q    At the light level? Any transferability to sedentary?

A    No, there isn't any.

Q    Okay. Okay, assume a person has the following residual functional capacity: the ability to perform light work, ability to, to sit for six hours out of eight, stand for six hours out of - - stand or walk for six hours out of eight; occasionally climbing of stairs - -

A    I'm sorry, sit, sit for six hours, you said?

Q    The ability to sit for six.

A    Okay. And - -

Q    The ability to stand and/or walk for six.

A    Okay, thank you.

Q    The ability to occasionally climb stairs and ramps, balance, stoop, kneel, bend at the waist, crawl. One second. Limited to simple, routine, repetitive tasks, not performed in a

fast-paced production environment, involving only simple work-related decisions, and in general

relatively few workplace changes. Bo interaction with the general public, occasional interaction

with supervisors and coworkers. Now before I ask you any questions about jobs, that last

limitation, would that limit an individual to jobs at an SVP level of 3 or below?

A   No.

Q   Four or below?

A   I'm sorry?

Q   Or what SVP would that limit?

A   Oh, the SVP to 2 - - will be 2 and below. The last you had was no interaction

with the public.

Q   Okay. So that limitation that I just put in there would limit someone to a job that

was SVP of 2 or below?

A   Two or below, correct.

Q   Okay. I'm going to - - as the past relevant work was medium, they would be,

they would be unable to perform that past relevant work, is that correct?

A   That's correct.

Q   And there would be no transferability, is that correct?

A   Not to a sedentary level.

Q   Or to any level because of the limitation as I added?

A   With your limitation, no.

Q   Okay. To these limitations, add a vocational factor by assuming a hypothetical

person of the claimant's age, education, and work history. In your opinion, would there be a

significant number of jobs in the national economy such a person could perform?

    A     No, there would not be.

    Q     And what was that, that - - what limitation would that be, that makes there no jobs at the light level?

    A     At the light level using the restrictions that you gave?

    Q     Um-hum.

    A     Okay, well they - - she could perform some positions, I'm sorry.

    Q     Let me start again.

    A     Yes, because you have me a little confused; I'm sorry.

    Q     What, what was your understanding of my hypothetical?

    A     You said the individual to perform the light; light, light exertion level position - -

    Q     Um-hum.

    A     - - could sit six hours of a day; stand/walk six hours of the day; occasional climbing, crawling, balance, stooping, kneeling, and bending at the waist; simple, repetitive instructions; now fast-paced; simple decision making; few work changes; no interaction with the public; and occasional interaction with the supervisors.

    Q     And coworkers.

    A     And coworkers.

    Q     To that hypothetical, she could perform the position of a garment sorter, which is an VP of 2, unskilled position performed at a light exertion level - -

    Q     Slow down, please. What was the - - that's exertion level light?

    A     Correct.

Q     And the SVP is 2?

A     Two, unskilled.

Q     Okay.

A     440,000 positions in existence in the national economy.

Q     Um-hum.

A     Also a ticket-taker, SVP 2, light, over 104,000 positions. And a mail clerk, SVP 2, light, over one million positions.

Q     Okay. And are these jobs consistent with the descriptions in the DOT or any other relevant vocational sources?

A     Yes, they are.

Q     Okay. Now I want to go back, just because I'm a little confused. What did you think was in the hypo that made you say no jobs? Because I, I, I mean - -

A     I'm sorry, I, I, I understood that you wanted to go back to her transferable skills in any position in that.

Q     Oh, okay, because - -

A     So that's why I said no.

Q     - - I, I just want to make it clear that I'm, I'm not trying - - I, I don't want you to change your answer, I - -

A     No, no, no. I, I, I thought that you were saying does she have any transferability to light or sedentary at the SVP - -

Q     Okay.

A     - - 4 or 3. And that, the answer's still no.

Q       Thanks.  Okay, now add the following limitation - -

A       Um-hum.

Q       Okay, assume the individual, due to their symptomology, would be unable to perform their job for periods throughout the day, okay, and it could be from a number of impairments, but the bottom line is they'd be unable to perform their job for periods throughout the day.  And I'm going to call that in general as being off-task.  If they were off-task 20 per cent of the workday, would that change your testimony?

A       Yes, it would.  The individual needs to be on task at least 20 per cent of the time or more.

Q       They need to be on task - -

A       They need to be on task, correct.  So you're giving me 20 per cent is the borderline with not being able to work on their job.  This - - the having to go throughout the job on and off from their off-task - -

Q       My math isn't great, but you said they had to be on task for at least - -

A       They have to be on-task - - off - - they, they are allowed to be off-task 20 per cent of the job.  Anything above 20 per cent up - - like 20 to 25, they are not - -

Q       Okay.

A        - - employable.

Q       So if they were more - - if they were regularly off-task more than 20 per cent - -

A       Correct.

Q        - - would that change your testimony?

A       Correct.  Twenty-five per cent or more.

Q      They would - - so how would that change your testimony?

A      There would not be any employment.  They have to be on-task.

Q      Okay, now what if, instead of being off-task, they just wouldn't be able to come to work.  And let's say that would be at least one day a week.  They would be absent from work at least one day a week.

A      They're only allowed to miss work a half - - a half a day per month, so one day per week would not be acceptable, so the individual would be precluded from employment.

ALJ          Okay.  Counsel?

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q      The percentages that you were mentioning, 20 to 25 per cent, about being on-task - - you just have  - -

A      Being off-task.

Q      Being, being off-task.

A      Being off-task.

Q      Off-task 20 to 25 per cent, from what - - where does that come from, that figure?

A      That comes from information from the employment offices.

Q      It's not for any standard government guidelines or regulation you know of.

A      No.

Q      And how do you quantify somebody being off-task when they have concentration and memory difficulty?  Is there severely or marked restrictions in concentration equal a certain percentage?  How does that work?

A      No, it's a period of time being off-task.

27

Q      But - -

A      If, if the individual has to take breaks or is daydreaming or not able to concentrate on the task at hand - -

Q      Okay.

A      And that occurs in every hour 10-15 minutes at a time, then that's not acceptable.

Q      Ten to fifteen minutes an hour is not - -

A      Correct.

Q      - - acceptable. Okay. Now if a person - - if a - - my, my problem is how do you quantify it when a person says, like a psychiatrist or a psychologist says this person has severe concentration problems, or marked concentration problems? Does that equate in a hypothetical situation to a certain minute - - number of minutes an hour?

A      Yes, severe and marked is about six hours of the day they're not able to concentrate. Sixty per cent of the time.

Q      So a person who has been told - - or it has been opined - - has severe or marked concentration problems, in any hypothetical relating to their physical capabililties, would not be able to maintain a job in the national economy, would that be correct?

A      Correct.

Q      With those severe or marked restrictions.

A      Correct.

ATTY      Thank you. That's all I have.

ALJ      Your - - where you equate that, is that - - did you get that from Social Security regulations and rules, or where does that come from?

28

VE      No, I didn't.  That came from discussing it with different physicians that are experts - -

ALJ      Okay, so that's not a Social Security standard, that's - -

VE      No.

ALJ      Okay.  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.  No, it's not.

ATTY      That's why, Your Honor, I asked the questions that - - you know, I am often troubled with how to put that into a percentage for the purpose of a hypothetical.

ALJ      Well you just - - I mean, it's a hypothetical, you put - -

ATTY      Well, not - - you know, what's the number?  It is 60 per cent, you know, it is 80 per cent?  Which is why I asked the expert, so thank you.

*          *          *

E.      Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

- Lives in a house with her husband and eighteen-year-old daughter.  (Tr. 87, 180)

- Watches television.  (Tr. 87)

- Tries to do dishes and clean the house, including dusting.  (Tr. 87, 89)

- Takes care of daughter and husband; tries to cook food for them. (Tr. 88)

- Prepares food daily (or weekly), including sandwiches and frozen dinners.  (Tr. 89)

- Tries to go outside every day.  (Tr. 90)

- Able to drive a car.  (Tr. 90)

- Shops in stores for food and clothes, 3-4 hours at a time. (Tr. 90, 105)

- Able to pay bills, count change, and use a checkbook/money order. (Tr. 90, 105)

- Becomes upset around other people. (Tr. 92)

- Does not follow written or spoken instructions very well. (Tr. 92)

- Does not handle stress very well. (Tr. 93)

- Uses a cane for walking. (Tr. 93, 109)

- Needs help getting out of bed and bath, and clothing herself. (Tr. 103)

- Does puzzle books. (Tr. 106)

- Talks with people on the phone once per week. (Tr. 106)

- Can walk "not far," or 10 feet, before needing to stop and rest. (Tr. 92, 107)

- Able to follow the television shows she watches. (Tr. 183)

- Smokes 1 to 1.5 pack(s) of cigarettes per day. (Tr. 203, 318)

- Drinks twenty-four cups of coffee, and seven cans of soda, daily. (Tr. 203)

- Goes out to dinner twice per month. (Tr. 207)

- Her son visits four times per week. (Tr. 207)

- Able to vacuum. (Tr. 339)

- As of 4/22/06, attends church. (Tr. 366).

### III. The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant alleges the ALJ erred in finding her affective disorder did not meet Listing 12.04, and in finding her back impairment did not meet Listing 1.04. Commissioner contends substantial evidence supports the ALJ's finding Claimant did not meet or equal Listings 12.04 and 1.04.

B.     The Standards.

1.     Summary Judgment.  Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.     Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.     Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.     Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S.

31

Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§
404.1508, 416.908.

5.    Disability Prior to Expiration of Insured Status- Burden. In order to receive
disability insurance benefits, an applicant must establish that she was disabled before the
expiration of her insured status. Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42
U.S.C. §§ 416(I), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.    Social Security - Standard of Review. It is the duty of the ALJ, not the courts, to
make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to
determining whether the findings of the Secretary are supported by substantial evidence and
whether the correct law was applied, not to substitute the Court's judgment for that of the
Secretary. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.    Social Security - Scope of Review - Weight Given to Relevant Evidence. The
Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently
explained his rationale in crediting certain evidence in conducting the "substantial evidence
inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot
determine if findings are unsupported by substantial evidence unless the Secretary explicitly
indicates the weight given to all of the relevant evidence. Gordon v. Schweiker, 725 F.2d 231,
235-36 (4th Cir. 1984).

8.    Social Security - Substantial Evidence - Defined. Substantial evidence is such
relevant evidence as a reasonable mind might accept as adequate to support a conclusion.
Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat
less than a preponderance. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.     Social Security - Sequential Analysis.  To determine whether Claimant is

disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920,

and determine: 1) whether claimant is currently employed, 2) whether she has a severe

impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether

the claimant can perform her past work; and 5) whether the claimant is capable of performing

any work in the national economy.  Once claimant satisfies Steps One and Two, she will

automatically be found disabled if she suffers from a listed impairment.  If the claimant does not

have listed impairments but cannot perform her past work, the burden shifts to the Secretary to

show that the claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th

Cir. 1984).

C.     Discussion

1.     Whether the ALJ Erred in Determining Claimant's Depression Did not
       Meet or Equal Listing 12.04.

Claimant contends the ALJ erred in concluding she did not meet or equal Listing 12.04.

She specifically alleges the ALJ, in finding she did not meet Listing 12.04, failed to properly

consider the opinions from Dr. Michael Malayil (Claimant's treating physician), Amy Ralston

(Claimant's treating therapist), and Dr. Golas (a state-agency expert) that Claimant had

deficiencies in concentration or met Listing 12.04.[5]  Commissioner argues the ALJ justifiably

discredited Ms. Ralston's and Dr. Malayil's opinions because they are unsupported by the record

---

[5] Claimant does not challenge the ALJ's finding regarding the "C" criteria of Listing
12.04.  Rather, she only challenges the ALJ's treatment of the three identified medical sources.
Accordingly, the Court's analysis will be limited to determining whether the ALJ's treatment of
the three identified medical sources is supported by substantial evidence and involved the correct
application of law.

and inconsistent with evidence of Claimant's lifestyle. Commissioner further argues the ALJ justifiably discredited a portion of Dr. Golas' opinion, and that the Court should defer to the ALJ's treatment of Dr. Golas' report and refrain from re-weighing Dr. Goya's report.

At step three of the sequential analysis, an ALJ must determine whether any of a claimant's impairments meet or equal the impairments listed in 20 C.F.R. pt. 404, subpt. P, app. 1. SSR 86-6. A finding that a claimant's impairment meets or equals a Listing in Appendix 1 results in a determination of disability without the need for further review, because the impairments listed in Appendix 1 "would ordinarily prevent an individual from engaging in any gainful activity." Id. The claimant bears the burden of proving that their impairment meets all - not merely some - of the requirements of a listed impairment. Fleming v. Barnhart, 284 F. Supp. 2d 256, 269 (D. Md. 2003); see, also, Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995). In order for the reviewing court to determine if the Secretary based the agency's decision on substantial evidence, the ALJ's decision must include his reasons for determining that an impairment does not meet a listed impairment. Cook v. Heckler, 783 F.2d 1168, 1172 (4th Cir. 1986). When reviewing a medical opinion from a source such as a social worker, the ALJ may consider that individual's opinion insofar as it relates to the severity of an impairment and how it affects the claimant's ability to work. 20 C.F.R. § 404.1513(d).

Listing 12.04, Affective Disorders, is met when the requirements in both "A" and "B" are met, or when the requirements in "C" are satisfied. 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.04. The "A," "B," and "C" criteria of Listing 12.04 are as follows:

The "A" criteria require "medically documented persistence, either continuous or intermittent, of one of the following:"

1. Depressive syndrome characterized by at least four of the following:
   Anhedonia or pervasive loss of interest in almost all activities
   Appetite disturbance with a change in weight
   Sleep disturbance
   Psychomotor agitation or retardation
   Decreased energy
   Feelings of guilt or worthlessness
   Difficulty concentrating or thinking
   Thoughts of suicide
   Hallucination, delusions or paranoid thinking
2. Manic syndrome characterized by at least three of the following:
   Hyperactivity
   Pressure of speech
   Flight of ideas
   Inflated self-esteem
   Decreased need for sleep
   Easy distractibility
   Involvement in activities that have a high probability of painful consequences
   which are not recognized
   Hallucinations, delusions or paranoid thinking
3. Bipolar syndrome with a history of episodic periods manifested by the full
   symptomatic picture of both manic and depressive syndromes (and currently
   characterized by either or both syndromes)

The "B" criteria are satisfied by evidence of at least two of the following:

1. Marked restriction of activity of daily living

2. Marked difficulties in maintaining social functioning

3. Marked difficulties in maintaining concentration, persistence, or pace.

4. Repeated episodes of decompensation, each of extended duration.

The "C" criteria "describe impairment-related functional limitations that are incompatible

with the ability to do any gainful activity," id. at §12.00, and are satisfied by evidence of:

"a medically documented history of a chronic affective disorder of at least 2 years'
duration that has caused more than a minimal limitation of ability to do basic work
activities, with symptoms or signs currently attenuated by medication or psychosocial
support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

35

2.  A residual disease process that has a resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3.  Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement."

Id. at Listing 12.04(C).

The ALJ in the present case found Claimant's affective disorder did not meet Listing 12.04. Specifically, he found although Claimant satisfied some of the "A" criteria, Claimant did not exhibit a "marked or equivalent limitation in two (in fact, in any)" of the four "B" criteria categories. (Tr. 16). To the contrary, the ALJ found Claimant had only a mild restriction in her activities of daily living; only moderate difficulty in social functioning; only a moderate limitation in concentration, persistence, and pace; and experienced no episodes of decompensation. (Tr. 16). The ALJ furthermore found Claimant did not satisfy the "C" criteria of Listing 12.04 because she did not "require treatment for an exacerbation of her symptoms." (Tr. 16). In making the above findings, the ALJ considered medical records, evidence of Claimant's lifestyle, and evidence of Claimant's credibility. (Tr. 16-22). Ultimately, he credited Dr. Malayil's March 2006 opinion that Claimant's concentration and thought processes were in order (Tr. 16, 258); discredited Dr. Malayil's March 2006 opinion Claimant had a GAF of 50 (Tr. 21, 258); discredited as "conclusory and unsupported" Dr. Malayil's and Ms. Ralston's March 2007 opinions Claimant's depression satisfied the "B" criteria of Listing 12.04 (Tr. 22, 368, 371); and discredited Dr. Golas' November 2004 opinion Claimant was markedly deficiently in concentration and recent memory (Tr. 20, 200).

The Court has reviewed the ALJ's decision and the record, and finds Claimant's challenge to the ALJ's treatment of the three medical sources is without merit. The ALJ's

36

treatment of each medical source is discussed in turn:

Dr. Malayil

As mentioned above, the ALJ credited the portion of Dr. Malayil's March 2006 report that established Claimant's concentration and thought processes were in order. (Tr. 21, 258). He discredited, however, the portion of Dr. Malayil's March 2006 report wherein the doctor concluded Claimant had a GAF of 50. (Tr. 21, 258). The ALJ's discredit of Dr. Malayil's GAF rating is supported Dr. Malayil's own notes regarding Claimant's retained level of cognitive functioning; evidence of Claimant's lifestyle (Tr. 87-89, 90, 105, 106, 106, 207, 207, 366);[6] and other medical evidence of Claimant's retained social and personal functioning (Tr. 178, 183, 200, 209, 215, 229, 313, 323 ).[7]

The ALJ also discredited as "conclusory and unsupported" Dr. Malayil's March 2007 opinion that Claimant's depression satisfied the "B" criteria of Listing 12.04. (Tr. 16, 21, 268, 371). The ALJ's discredit of this portion of Dr. Malayil's March 2007 opinion is supported by Dr. Malayil's own notes in March that Claimant's "thoughts were organized; she was oriented to time, place, and person; her cognition is fairly intact; she has some insight into her problems" (Tr. 258); evidence of Claimant's lifestyle (see Tr. 87-89, 90, 105, 106, 106, 207, 207, 366); and numerous other medical records documenting Claimant's retained cognitive functioning and possible malingering. (See Tr. 178, 183, 200, 209, 215, 229, 313, 323).

---

[6] For example, Claimant retains the ability to watch television, prepare small meals, shop, do puzzles, talk on the phone, attend church, visit with her son at her house, and eat out. (Tr. 89, 90, 105-06, 183, 207, 366).

[7] A global assessment of functioning score in the 41 to 50 range indicates serious symptoms (i.e: suicidal ideation, severe obsessional rituals, frequent shoplifting) or a serious impairment in social, occupational, or school functioning (e.g: no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders (DMS-IV) 32.

Although Douglas MacPherson, D.C., characterized Claimant as depressed and disabled (Tr. 346-357, 375), the ALJ reasonably discredited Mr. MacPherson's opinion as being from an "other source[]" and entitled to less weight. See 20 C.F.R. § 404.1513 [establishing non-acceptable medical sources may be relied on insofar as they offer an opinion on the severity of an impairment and its impact on the claimant's ability to work.]; see, also, id. at § 404.1527(d) [establishing the factors to be considered when weighing medical opinions]. Because Mr. MacPherson is a chiropractor, and therefore not a specialist in mental health disorders, the ALJ was entitled to discredit Mr. MacPherson's opinion on the severity and impact of Claimant's depression.

### Ms. Ralston

As mentioned above, the ALJ discredited as "conclusory and unsupported" Ms. Ralston's March 2007 opinion that Claimant's depression satisfied the "B" criteria of Listing 12.04 (Tr. 22, 368, 371). For the same reasons set forth above in regards to the ALJ's discredit of Dr. Malayil's March 2007 report, the Court finds the ALJ's discredit of Ms. Ralston's March 2007 report is supported by substantial evidence and involved a correct application of the law. Specifically, evidence of Claimant's lifestyle does not support the degree of mental limitation reported by Ms. Ralston. (See Tr. 87-89, 90, 105, 106, 106, 207, 207, 366). For example, Claimant retains the ability to watch television, prepare small meals, shop, do puzzles, talk on the phone, attend church, visit with her son at her house, and eat out. (See Tr. 89, 90, 105-06, 183, 207, 366). Furthermore, the medical record does not support the degree of mental limitation reported by Ms. Ralston. (See Tr. 178, 183, 200, 209, 215, 229, 313, 323).

### Dr. Golas

The ALJ adopted Dr. Golas' opinion that Claimant had logical thought processes, coherent speech, lacked perceptual disturbances, was fully oriented, had good insight and judgment, and exhibited persistence and pace within normal limits. (Tr. 20, 200). The ALJ rejected, however, Dr. Golas' opinion that despite the above observations, Claimant's concentration and recent memory was markedly deficient. (Id.) In so doing, the ALJ explained Dr. Golas' findings were inconsistent with the medical evidence, based solely on the claimant's subjective complaints, and void of any documented consideration of Claimant's credibility. (Tr. 20). The ALJ's treatment of Dr. Golas' opinion is supported by substantial evidence. First, as the ALJ noted, Dr. Golas's failure to discuss Claimant's credibility is at odds with the substantial number of reports in the record documenting Claimant possible malingering or exaggeration of symptoms. (See Tr. 178, 183, 247). The ALJ was therefore justified in attributing less weight to Dr. Golas' opinion. Second, substantial evidence in the record is contrary to Dr. Golas' finding that Claimant's concentration and recent memory were markedly deficient. For example, DDS Physician Joseph Kuzniar rated Claimant as having only moderate deficiencies in concentration, and as being not significantly limited in areas of memory. (Tr. 215, 229). Similarly, Ms. Cooper-Lehki, D.O., reported Claimant was alert and oriented and reported that Claimant's alleged memory loss was "very atypical" for persons with "true mental illness or mental injury." (Tr. 178). While it may reasonably be argued Dr. Malayil's and Ms. Ralston's reports provide support for Dr. Goyas' opinion, it is not the Court's role to re-weigh the evidence or substitute its judgment for that of the Commissioner. See Craig, 76 F.3d at 589. So long as the ALJ's decision to credit one medical opinion and discredit another opinion is, as in the present case, supported by substantial evidence and legally sound, the Court will defer to the ALJ's decision.

See id.

For the aforementioned reasons, the Court recommends Claimant's first ground for relief be denied.

>   2.      Whether the ALJ Erred in Determining Claimant's Spine Impairment Does Not Meet or Equal Listing 1.04.

Claimant alleges the ALJ erred in concluding her spine impairment does not meet or equal Listing 1.04. She specifically alleges the ALJ gave undue weight to Dr. Nutter's December 2004 report, and improperly dismissed Claimant's need for a cane and Mr. MacPherson's reports. Commissioner argues Claimant's allegation is without merit because the medical record supports the ALJ's finding regarding Listing 1.04, and supports his treatment of Claimant's need for a cane and Mr. MacPherson's opinion.

Listing 1.04, Disorders of the Spine, provides: "(e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

>   A.      Evidence of nerve root compression characterized by a neuro-anotomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

>   B.      Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

>   C.      Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. pt. 404, subpt. P, app. 1, Listing 1.04.

The ALJ in the present case concluded Claimant had the severe impairment of spinal disc disorder. (Tr. 15). During step three of the sequential analysis, he concluded her spinal disorder did not meet or equal Listing 1.04. Specifically, he found "during the period at issue the claimant really had no indication of significant neurological loss and was able to get around on a regular basis . . . However, during the period at issue, the claimant was seriously limited." (Tr. 16). The Court has reviewed the record and finds for the following reasons the ALJ's conclusion is supported by substantial evidence, and resulted from a proper application of law.

First, the ALJ's determination Claimant does not have any "significant neurological loss and [is] able to get around on a regular basis" is supported by substantial evidence. For example, MRIs of Claimant's spine immediately following her work-related injury in June 2003 revealed the absence of cord injury or anatomical injuries; normal size of thoracic and vertebral bodies; normal tissues; and normal size and signal throughout. (Tr. 271-287). While the MRIs revealed small lesions, Dr. Ochoa opined the lesions were not traumatic in nature. ( Id.) Similarly, Progress Notes dated October 2003 from the Family Health Care noted Claimant had no "gross neural deficits" (Tr. 233); Mr. Schreiber, D.O., reported in October 2004 Claimant's gait and stride were symmetric and the sensation in her lower extremities was normal throughout (Tr. 337); Dr. Nutter, in December 2004, found no evidence of paravertebral spasm (Tr. 209); finally, in February 2005, a DDS Physician opined Claimant could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, and sit/walk/stand for 6 hours in an 8 hour workday (Tr. 247).

Although there is ample evidence in the record of Claimant's pain and restricted movement resulting from her back impairment, (Tr. 200, 209, 233, 300, 302, 303, 315, 323,

375), the ALJ was justified for the following reasons in assigning limited weight to Claimant's allegations of back pain and limitations. A) Numerous medical sources questioned Claimant's credibility. For example, Dr. Parsons noted in August 2004 that "the presentation seen on neuropyschological testing today indicates a conscious exaggeration of cognitive problems rather than a somatoform presentation." (Tr. 183). Similarly, physical therapist Cari Woods noted in June 2003 that "patient has shown inconsistencies with LE strength grades and functional level. Patient does not appear to put full effort into testing." (Tr. 292). Additionally, Dr. Brown noted in July 2004 that "a few of [Claimant's] symptoms are also coachable or disappear when she is distracted." (Tr. 323). B) Evidence of Claimant's lifestyle suggests she does not suffer from the degree of pain or limitation alleged. (See Tr. 89, 90, 105-06, 183, 207, 366).

Second, although the ALJ did not explicitly analyze Claimant's need for a cane, his decision reflects he was more than aware of Claimant's need for a cane. (Tr. 16-24). Furthermore, his statement that Claimant was able to "get around on a regular basis," despite his knowledge Claimant walked with a cane, is supported by the medical record, (Tr. 247, 292, 323, 337), and evidence of Claimant's lifestyle. (See Tr. 89, 90, 105-06, 183, 207, 366).

Finally, and contrary to Claimant's assertion, the ALJ did not err in his treatment of Dr. MacPherson's March 2007 Functional Capacity Evaluation report. (Tr. 21-22, 374). As discussed above in Section 1, the ALJ reasonably discredited Mr. MacPherson's opinion Claimant was totally disabled as being from an "other source[]" and entitled to less weight. See 20 C.F.R. § 404.1513; see, also, id. at § 404.1527(d) [establishing the factors to be considered when weighing medical opinions]. Because Mr. MacPherson is a chiropractor, and therefore not a specialist in mental health disorders, the ALJ was entitled to assign less weight to Mr.

42

MacPherson's opinion on the severity and impact of Claimant's depression.

For the aforementioned reasons, the Court recommends Claimant's second ground for relief be denied.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.     Claimant's Motion for Summary Judgment be **DENIED** because 1) the ALJ's treatment of Dr. Malayil's, Ms. Ralston's, and Dr. Golas' opinions, and his finding Claimant did not meet or equal Listing 12.04, is supported by substantial evidence and involved a correct application of law; and 2) the ALJ's conclusion Claimant did not meet or equal Listing 1.04, and his treatment of Claimant's need for a cane and Mr. MacPherson's report, is supported by substantial evidence and involved a correct application of law.

2.     Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: August 18, 2008

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE